UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.                                            Case No. 18-CR-80053-RLR

ALSTON ORLANDO LEROY WILLIAMS
_____/

**GOVERNMENT'S RESPONSE TO THE
DEFENDANT'S MOTION FOR DOWNWARD VARIANCE**

The United States of America, by and through its undersigned attorneys, hereby files its response to the defendant's request for a downward variance to demonstrate that life imprisonment is an appropriate sentence for this Defendant pursuant to both the Sentencing Guidelines and Section 3553(a) factors.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  Overview

As established during the jury trial and in the PSR in this matter, Defendant Alston Orlando Leroy Williams (hereinafter "the Defendant" or "Williams") is a manipulative, violent trafficker who preyed upon young girls by sexually exploiting and physically abusing them so that he could make money.  He ultimately coerced and forced numerous girls to prostitute themselves while beating them and others in their presence, creating a climate of fear.

His reign of violence and criminal activity spanned through the Southern and Middle Districts of Florida.  Once he had physical possession of the girls, he maintained possession and coerced them into prostitution through a cycle of romance and violence. On the "romance" end of the spectrum, Defendant would woo the girls, engage in sexual intercourse with them, and play favorites, ultimately manipulating and enticing them to do what he wanted.  On the other end of

the spectrum, Defendant would also use force and intimidation by subjecting the girls and others in their presence to beatings, threats of beatings, and threats with firearms.  Through the manipulative and violent environment he created, each girl worked as a prostitute for him and they were required to provide him with their cash proceeds.

### B.  Facts Elicited At Trial[1]

#### 1.  <u>T.L.</u>

T.L. met the Defendant in 2003 when she was 17 years old through a high school friend. She believed she fell in love with the Defendant, who used the nickname "Nino."  From her first jobs at Walgreens or nursing, the Defendant took her money.  Quickly he became violent, striking her head against the dashboard of the car and slamming her finger in the car door.  She described the Defendant's violence as horrific, but that her decisions throughout the rest of her life were based upon his grooming her into a "mini-Alston."

In 2005, upon seeing an advertisement for attractive people to make $1000, the Defendant encouraged her to do it.  From this first instance, throughout her relationship with the Defendant, she said, "the more money I make, the happier Nino is; the happier Nino is, the less I get hurt."  It turned out this job was for prostitution, which T.L. turned down.  The defendant convinced her to go back and she had sex for money for the first time.  T.L. described this as the first of thousands of times over the next nine that years she prostituted for the Defendant until 2014.  She did this throughout Miami-Dade, Broward and Palm Beach counties.  On average, she testified, she worked 7 days per week, seeing upwards of 10 clients per day, and averaging $200 per client.  She testified that the Defendant took all of her money.

---

[1] The facts elicited at trial are based upon the undersigned's memory of the facts testified to by the witnesses and the evidence provided.  The undersigned did not have the aid of a transcript due to the inability to retrieve the same when the defendant's motion was filed on Tuesday, April 23, 2019 (DE 196) and the Court ordered this response by noon on Monday, April 29, 2019.

At first, she worked out of agencies where she slept when she was not prostituting. T.L. said she could not leave because she had nowhere else to go and was afraid that the Defendant would find her. T.L. testified that if she stopped working for him he would beat her. If she was not working, T.L. did whatever the Defendant told her to do including what clothes to wear, how to do her nails and her hair.

T.L. described the violent acts Williams did to her including: 1) pouring hot water on her knee, leaving a scar; 2) tossing her around the room, and using a full laundry bag to hit her in the head, from which she fell down and lost consciousness multiple times; 3) choking her with his hands; 4) spitting in her face; 5) putting sewing needles under her middle finger nail; and 6) tasing her multiple parts of her body. T.L. recalled a specific abuse she coined, "turning up the music." After seeing clients one night, T.L. and the Defendant got into argument in the car. Upon returning to his home, T.L. tried to get away, but the Defendant shut the door to the car. The defendant then went inside and turned on the music in the living room. He tossed her around the room and kicked her in the stomach. T.L. suffered a visible black eye, yet the Defendant had her prostitute the same time. Victim D.L. witnessed this incident.

The Defendant used intimidation to coerce T.L. to prostitute for him, including her arrest in 2006 in the Bahamas where he paid her bond and she felt she had to be loyal to him. When T.L. worked as a prostitute for the Defendant, she had communicate to him when she had an appointment, when she had the "change" (i.e. payment which is a word the Defendant used), and when the client left. As previously noted, the Defendant took all of the money T.L. made from prostitution because then her money was helping everyone. T.L. said the Defendant had an answer for everything.

The Defendant threatened T.L.: "he said he could kill me if he wanted to;" "he talked about

3

throwing me into the Everglades with the alligators; "he said that peroxide cleans blood up really well." T.L. testified that despite the violence, threats and prostitution, she could not leave because of her fear of beatings, that the Defendant would find her, and she felt mentally held down and brainwashed. In fact, T.L. testified she had two abortions as required by the Defendant, and during one of the pregnancies, he struck her to the ground.

On one of the dozens of old cellular phones recovered from the Defendant's residence in Lake Worth, prostitution photos of T.L. were uncovered. Moreover, in more recent 2016 text messages, when T.L. sent scantily dressed photos of herself to the Defendant, he responded, "Years back."

When the Defendant was in jail on these charges he reached out to T.L. for support, which at first, T.L. offered him. Then in 2018, T.L. got a call from the jailhouse inmate whom the Defendant had confided in. Through the inmate, the Defendant asked T.L. to contact the first two complaining victims, R.C. and G.R.L. to have them write letters that they made everything up about Williams' victimization of them.

### 2. Maryanne B.

T.L. also spoke about another girl whom the Defendant trafficked for sex: Maryanne B. Prostitution photos and text messages from the Defendant's Motorola phone of Maryanne B. were recovered and presented in evidence. The Defendant nicknamed Maryanne B. "Heely."

T.L. recalled how he used Maryanne B.'s father's illness and the fact that her mother died from AIDS as ways to make Maryanne B subservient to him. T.L. honestly stated she did not see any violence but when the Defendant was angry with Maryanne B., he took her into another room. Victim D.L. was with Maryanne B. when she prostituted and saw Maryanne B. give the Defendant all of her earnings. D.L. recalled Maryanne B. had a heart monitor and witnessed the Defendant

strike Maryanne B. in the heart; on another occasion while she was in the hospital, the Defendant unhooked Maryanne B. from the pacemaker machine and told her to "get to work."

### 3.  D.L.

Sixteen-year-old D.L. met the Defendant through her school friend Maryanne B.  The Defendant had D.L.'s identification from the time he met her.  They began a sexual and dating relationship at that time.  The Defendant told D.L. he was 25 and worked construction, when in fact he was much older and had not worked more than 1 month for honest pay since 2003.  The Defendant advised D.L. to drop out of school and get her GED, but he never encouraged again once she started prostituting for him.  D.L. learned the trade by watching Maryanne B. prostitute for the Defendant.  When she was 17, D.L. began to prostitute for the Defendant 1-2 times per week until her 18th birthday.  Prior to turning eighteen, the Defendant punched D.L. and she wanted to go home, but she too scared of the Defendant to leave.  Photos of D.L. as a 17-year-old were located on that same Motorola phone from the Hollywood arrest.

When D.L. turned 18, the Defendant ripped up her baby blanket she had, saying "its time to grow up," and she then began prostituting every day.  He broke up with her as boyfriend and girlfriend and she became an employee.  D.L. still had sex with the Defendant in order to make him happy.  D.L. worked in prostitution agencies, by posting ads on Backpage, and working in "all-girl staff" locations.  D.L. recalled that when she was once robbed by a client, the Defendant responded, "keep working," and "it will be ok."  He would text her codes like "grindtime" which meant to prostitute.  D.L. was required to respond in text with codes when she received a client, when she received the money, and when the client left.  Failure to do so would result in a beating. D.L. gave all of her money from prostituting to the Defendant; failure to do so resulted in a beating. The Defendant beat her also when she did not listen, talked back, did not bring him enough money,

burned the food she cooked for him, and smoked with clients.

Like T.L., D.L. described the Defendant "turning up the music" when he beat her. She described him as a "demon" and his eyes would "go black." In terms of violence, D.L. recalled being dragged around the house with pliers (and had the scar to prove it), having her hand put over a hot stove, being hit by the Defendant with a car, being tased (along with D.R. and R.C.), having mace put on her pillow, having her hair cut with a machete for forgetting a password, being punched, thrown on the floor, kicked until she blacked out, and hit so hard on the head with a cellular phone that it cracked the screen.

The Defendant used D.L. and the other girls, including D.R. for his own pleasure and manipulation. Discovered on the Defendant's Samsung SCH-R810 phone were multiple videos of D.L. and D.R. having sex at the Defendant's direction and for his amusement. D.L. further described that "Nino," as he liked to be called, controlled her cellphone and password, talked about her and the other girls being a family and loyalty. The Defendant had D.L. have two abortions at age 18 & 19. In fact, he was the only one having unprotected sex with D.L. and all of the girls. She revealed the covered up tattoo on her arm that the Defendant directed her to have with the nicknames "Pinky" for D.R., "Nino" and "Rosa" for R.C.

When D.L. did escape in 2012, the Defendant arranged a meeting with her to try to convince her to return. She kept in touch with him even after she left because she was so afraid of him and because the Defendant knew where her family lived. D.L. noted that through the time of the trial, she was still having nightmares about the Defendant.

4. <u>D.R.</u>

T.L. described that the first time she met D.R., who was 16 or 17 years old at the time, was when she got out of car with D.L. with the Defendant at a hotel where they were prostituting. The

Defendant had D.R.'s ID and her original birth certificate was discovered in a safe in his office after he was arrested.  D.L. said the Defendant went after D.R. because she was a "broken girl" like the rest of them.  The Defendant had D.R. prostituting on Backpage at 17 years of age.

City of Hollywood Police Department (HPD) officers testified to the 2008 arrest of the Defendant in which 17-year-old D.R. was arrested during an undercover sting and did a controlled call with the Defendant.  His phone revealed text messages with D.R., D.L. and Maryanne B. about engaging in prostitution.  Photos of 17-year-old D.R. posing for prostitution ads were recovered from the phone seized by the HPD.  D.R.'s Backpage ads through 2016 were presented through 2016 showing a nearly 8-year period of sex trafficking.

D.L. described the violence that she witnessed the Defendant inflicted upon D.R.: he hit her with shoes to give her a black eye; he hit her head with a water bottle; he grabbed her hand with pliers; he directed Maryanne B. to hit her while pregnant.  R.C. described the violence that she witnessed the Defendant inflict upon D.R.: he locked her in the trunk of the car.  Victim K.C. described what she witnessed the Defendant do to D.R.: when he took her into a room she came out crying.

5. R.C.

R.C. was the first victim to come out to law enforcement that she was trafficked by the Defendant.  As a senior in high school, she met the Defendant at a friend's party.  R.C. did well in school and had her whole life ahead of her.  She was taken aback by his maturity, attire, and the girls (D.R. and D.L.) he had around him.  She quickly moved into the house in Tamarac with the Defendant, D.R. and D.L.  Like the other girls, the Defendant took R.C.'s documents, as her passports and driver's license were found in the locked safe in his locked office.

R.C. was groomed into the prostitution business as well.  She noticed D.R. and D.L. out all

night wearing tight clothing.  The Defendant treated R.C. better than the other girls, and she fell in love with him.  The Defendant, as well as D.L. and D.R. at his direction, brought up the idea of "companionship dates" for R.C.  Nothing was said about prostitution.  But her first night, R.C. had sex for money.  Upon her return in the morning, R.C. gave her proceeds to D.L. who in turn gave them to the Defendant.  Hundreds of messages recovered from the Defendant's phones and the phones he provided R.C. confirmed constant encouraging texts, such as "Very good…Two pretty girls got on some pretty shit.  I LOVE IT WHEN A PLAN COME TOGETHER….:-)".

R.C. began to make the Defendant a lot of money and he was happy.  She became part of his "family."  Her nickname, "Rosa" was even tattooed on D.R. and D.L. along with their names and as always, the Defendant: "Nino."  Likewise, D.R., D.L. and the Defendant's nicknames were tattooed on R.C.'s back.

Regarding the prostitution, the Defendant directed what to post on Backpage and where to post.  R.C. recalled being choked, hit, robbed and raped on prostitution dates.  If she came home and there was a problem, the Defendant beat her.  R.C. was not allowed to go to the hospital for the injuries he inflicted and was told not to trust the police.

Broward County Sheriff Office (BSO) detectives testified to the arrest of R.C., D.L., D.R. and the Defendant in 2012 during an undercover sting.  R.C. was the prostitute, while the other three remained in an adjoining room.  When they were discovered, the Defendant said he was unemployed, but had no explanation for the $1400 (USD) he had.

Orlando area police officers testified about the 2014 arrest of R.C., D.R. and the Defendant during an undercover sting.  The money used to solicit R.C. was found on the Defendant along with fake ID's for the girls.  Also with the Defendant in his car was 17-year-old, and victim, G.R.L.

Regarding the violence R.C. endured, she testified that she received a beating when she did

not make enough money or did "hoe shit" which meant the Defendant felt she was looking at a person the wrong way.  The beatings included: being knocked unconscious, having needles poked in her rear end, having her vagina slapped until it bled, being punched in stomach, receiving black eyes, being kicked, choked, slapped, tased and handcuffed while beating her.  D.L. testified to witnessing the last of these.  R.C. recalled the Defendant instructing the girls to witness each other being beaten.  On one occasion, the Defendant dragged R.C. down the stairs by her hair.  R.C. testified these beatings were designed to make sure she continued to prostitute and keep producing money.

The Defendant used smart phone applications, including Glympse, Confide and Wickr, to track R.C. and communicate with her using messages that would then automatically erase.  R.C. testified about prostituting to thousands of clients.  On one particular phone, the evidence produced codes that R.C. relayed to one of the other girls for the Defendant during a 43-day period when she saw 127 clients.  These messages were on text and did not include the messages in the deleting applications like Wickr.  On another phone, the evidence produced codes that R.C. relayed to the Defendant during a 126-day period when she saw 112 clients.  Again, these messages were on text and did not include the messages in the deleting applications.

R.C. testified that the Defendant took all of her money and used it to buy himself whatever he wanted; that he ate well and had the girls eat fast food.  She never stole the money from the Defendant, despite making all of it for him, because she was loyal and was brainwashed to believe the Defendant had her best interests at heart.  In fact, she testified that the possessions she had were only the gifts she received from clients.

The Defendant had R.C. receive two separate surgeries: a tummy tuck and Brazilian butt lift in June 2013 and a breast augmentation in November 2013.  Both of these were designed to

enhance R.C.'s body so she would be more productive as a prostitute for the Defendant.

In 2015, the Defendant moved himself, his mother, R.C., D.R. and G.R.L. to a house that his mother purchased in Lake Worth Florida. That house was purchased using the illegal proceeds of prostitution and fabricated loan applications by the Defendant's mother. The Defendant, his mother, and their real-estate agent, were all separately indicted for this series of transactions. Curt Francis, the real-estate agent, plead guilty to this conspiracy.[2] The Defendant set up security cameras inside and outside the home to monitor the girls every movement. He set up the sleeping arrangements. He even created an office, or "the O" as the girls called it, where he had the only access, kept a firearm, and had a locked safe in which he maintained identifications and documents from the girls he trafficked over the years, along with over $12,000 (USD) in cash.

Finally, in November 2017, the Defendant took R.C. and G.R.L. to his mother's house in St. Thomas, where they were directed to clean up the house after a hurricane. R.C. devised a plan to escape the Defendant. On November 29, 2017, she contacted the Palm Beach County Sheriff's Office, who received her posing as a client. The Defendant was later arrested and G.R.L. was recovered from him as well.

6.  Crystal R.

Another girl being groomed by the Defendant was Crystal R. As with the other girls, her identification was discovered in the Defendant's office. Recovered from his phone was a video he captured of R.C. performing oral sex on Crystal R., at the Defendant's direction while he maintained the taser in his hand. Crystal R. escaped the Defendant and he spent months trying to

---

[2] The charges against the Defendant's mother, Dorothy Williams, were dismissed pursuant to her plea to other felony charges (discussed *infra*). The charges against the Defendant were dismissed solely because he announced ready for trial on the mortgage fraud before his human trafficking case was set for trial. The prostitution of the mortgage fraud would have necessitated three or four of victims in this case to be subjected to another round of testimony in this case. The Court denied the government request for a continuance and the government dismissed the charges against the Defendant.

locate her, including by texting her mother.  The Defendant lied to the mother about Crystal R.'s whereabouts as well as maintaining her documents.

### 7.   G.R.L.

Recovered with R.C. was G.R.L.  G.R.L. dropped out of high school at 16 years' of age. She had been sleeping in parks, or at friend's house.  G.R.L. met the Defendant in May 2013 when R.C. approached her and offered G.R.L. a call center job.  She moved into the Defendant's house a few weeks later.  Quickly she witnessed violence to the other girls and began having sex with the Defendant.  After the Defendant's arrest in 2014, G.R.L. was sent to her aunt's house.  The Defendant took her back to his home in Lake Worth where G.R.L. prostituted from May to August 2015.

G.R.L. testified she prostituted five to six days per week from 6pm to 6am and made approximately $500 per night.  When she got home she put the money in the Defendant's pajamas or woke him up to give it to him.  G.R.L. prostituted for the Defendant with R.C., D.R. and K.C. G.R.L. said, "if I made money, the Defendant would not hurt me."  As with R.C., G.R.L. testified that she had to update the Defendant using the smartphone applications Confide, Wickr and BurnNote.

Having not been as successful at prostituting as D.R. and R.C., the Defendant turned G.R.L. into the house slave, where she cooked, cleaned, ran his errands and did other house chores for him.  In 2016, G.R.L. became pregnant with the Defendant's baby, and he directed her to abort the baby.  Despite the doctor's direction for G.R.L. to not engage in sexual intercourse for at least two weeks, the Defendant had sex with her four days after the abortion.

The Defendant's middle name, "Orlando," was tattooed on G.R.L.'s hand.  She testified that he wanted her to have the perfect body and that the "family", including G.R.L., needed to be

loyal to him.  She never had a room to her own in the house and slept on the floor.  The Defendant would torture her, including using the taser.  A video was recovered from his phone in which he wakes G.R.L. up from sleep by operating the taser within inches of her head.  When they had sex, G.R.L. was unable to have an orgasm, so the Defendant would constantly have sex with her to get her to orgasm or have her masturbate.  As G.R.L. described, "you can't say no to the Defendant."

Regarding the violence she endured while prostituting or working at the house, G.R.L. said she would get beat for doing "hoe shit," which included walking too feminine to attract men or making eye contact with men.  She would get tased for doing "hoe shit' too.  G.R.L. recalled being hit and slapped in the face, ordered to strip and hit on the vagina with a spatula, having her hands tied with a bug zapper and being electrocuted for giving the Defendant wrong answers, and being struck on the head with a phone.  The Defendant kicked G.R.L. while she was on the floor, choked her, pointed his gun at her, and threatened her if she left him.  Through all of this, G.R.L. responded with kindness and love to the Defendant to keep him happy.

### 8.   K.C.

K.C. was the Defendant's son's girlfriend.  They moved in with the Defendant in the Lake Worth house in the summer of 2015.  After K.C. left and then returned, the Defendant told her she was to work for an agency and she was given the codes to report for prostitution.  K.C. believed she had to do what she was told because she was scared of the Defendant.  During her first prostitution appointment she was raped for 90 minutes.  She began working every day, 7pm – 8am, and saw five to eight clients per night, half of which were for sex.  If she got a day off, it was because the Defendant told her she could.  He made her work even when she had her menstrual cycle.

During one appointment, K.C., R.C. and another girl went to a client's home.  K.C. was

brutally raped and beaten.  When she ran out of the home, the third girl with them videotaped the encounter, which showed K.C. fleeing the residence into R.C.'s arms.  The police were called, but because the Defendant would be angered, they did not tell the police they were being trafficked.

In regards to the violence that K.C. suffered so that she would prostitute, K.C. recalled three specific incidents.  Because K.C. was diabetic, and her medication went missing, she believed the Defendant had hidden it.  She became ill and the Defendant still made her work.  Even when she self-admitted to the hospital, she feared telling the staff about the Defendant.  During one argument she had with the Defendant, he threw her across the kitchen causing bruising.  Two nights later when the police came due to a noise complaint K.C. said nothing.  Finally, in order to discipline K.C., the Defendant ordered his own son to hurt K.C. because she was not "being humble."  The Defendant instructed his son saying, "go ahead and handle that."

### 9.  After the Arrest

After the Defendant's arrest, the Lake Worth home was searched on two separate occasions revealing dozens of identifications of these girls, two firearms, cash, the taser, handcuffs, and other physical evidence.  His minivan and Mercedes were both seized as they were used to transport the girls for prostitution dates.

While in jail her attempted to use the services of another inmate to have R.C. and G.R.L. recant their testimony to the police.  He described five of the girls to the inmate, calling them "the little one" (G.R.L.), "the big one" (R.C.), "Pinki" (D.R.), "Traci" (T.L.) and "the girl from Tampa (D.L.).  To the inmate, the Defendant confirmed his prostitution activities, prior arrests including D.R. as a juvenile, the money made from prostitution, the $12,000 (USD) in the office safe, that G.R.L. would hold all the credit/bank cards, that the identifications in the office were of all the girls he prostituted, that he would get upset if he couldn't reach T.L. or D.R. by phone from jail,

the violence with tasers, batons, needles, that he would make the girls jealous of each other, and that he had the girls clean his mother's house in the islands such that R.C. got upset because it was "man's work"

In addition, while in jail, pending charges in this case, the Defendant, his mother and the same real-estate agent who purchased the Lake Worth house, conspired over the phone and with T.L's help to obtain an energy loan for the Lake Worth house. However, this loan was a fraud, because the Defendant's mother had no intent to upgrade the air conditioning, vents, gutters or roof as she had told the loan company. Instead, the money was to be used to hire the Defendant a lawyer to represent him and pay the over-due mortgage payments on the house. The three individuals[3] were also separately indicted on this fraud. Both the Defendant's mother and the real-estate agent plead guilty to this fraud.

### C.  Criminal Charges and Outcomes

On March 8, 2018, Williams was indicted by a federal grand jury on the following offenses: (i) sex trafficking of a minor in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(2) (Count One); (ii) sex trafficking by force, fraud, and coercion in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(1) (Counts Two, Three, and Four); and (iii) forced labor trafficking in violation of 18 U.S.C. § 1589(a) (Count Five).

On August 2, 2018, a superseding indictment was handed down against Williams on the following offenses: (i) sex trafficking of a minor in violation of 18 U.S.C. §§1591(a)(1) and (b)(2) (Count One and Nine); (ii) sex trafficking by force, fraud, and coercion in violation of 18 U.S.C.

---

[3] The charges against the Defendant were dismissed solely because he announced ready for trial on the wire fraud before his human trafficking case was set for trial. The prostitution of the mortgage fraud would have necessitated three or four of victims in this case to be subjected to another round of testimony in this case. The Court denied the government request for a continuance and the government dismissed the charges against the Defendant.

§§ 1591(a)(1) and (b)(1) (Counts Two, Three, Four, Six, Seven, Eight, and Ten); (iii) forced labor trafficking in violation of 18 U.S.C. § 1589(a) (Count Five); and Obstructing a Sex Trafficking Investigation, in violation of 18 U.S.C. § 1591(d) (Count Eleven).

The trial against Defendant began on November 30, 2018.  On December 20, 2012, the jury found Defendant guilty of Counts One, Two, Four, Nine, Ten and Eleven.

## II.  LEGAL STANDARD

"A district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *Gall v. United States*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Id.*  In calculating the appropriate advisory guideline range, the district court should consider all relevant conduct proven by a preponderance of the evidence.   In considering relevant conduct, the court may consider acts, which a defendant has not been charged or has been acquitted as long as those acts are proved by a preponderance of the evidence.  *See United States v. Faust,* 456 F.3d 1342, 1347 (11th Cir. 2006).  After determining the applicable advisory Guideline range, the district court must then consider the sentencing factors pursuant to 18 U.S.C. § 3553(a) to shape an appropriate sentence.

## III.   ARGUMENT IN FAVOR OF A LIFE SENTENCE

A review of the sentencing guidelines and a holistic consideration of the Section 3553(a) factors demonstrates that a life sentence of incarceration is warranted for the Defendant under the facts of this case.  Below, the United States addresses the Section 3553(a) factors in turn:

### A.  Nature and Circumstances of the Offense

As fully articulated above, in the PSR and as presented during the three weeks of trial in this case before the Court, the Defendant manipulated and preyed on young girls to sexually exploit

and physically abuse, so that he could make money as a human trafficker. He victimized at least six different girls during a fifteen-year period throughout the Southern District of Florida.  His known victims include D.L. from the time she was 16 years' old, R.C. from the time she was 18 years old, G.R.L. from the time she was 18 years old, T.L. from the time she was 18 years old, K.C. when she was 18 years old, and D.R. from at least the time that she was 17 years old.

The Defendant intentionally targeted and preyed upon young girls with troubled lives. Each victim was particularly vulnerable at the time they met the Defendant due to financial turmoil or familial problems. This vulnerability, coupled with the victims' mental immaturity, opened the door for the Defendant's manipulation.

He lured the girls in in a variety of ways: by pretending to be romantically interested in the girls, charming them, or intimidating them.  Once the girls were lured in, he employed cyclical techniques to control the girls.  At one end of the spectrum, he would be sweet and charming to the girls.  On the other end, he used verbal threats, physical beatings, and threats with weapons.  The violence included the use of tasers, kitchen utensils, his fists, and more.  He created an atmosphere of both fear and manipulation.  He ultimately forced and coerced the victims to work as prostitutes, often times in motels with more than a dozen clients per day.  The defendant wholly profited from the sex acts with the cash going to him.

### B.  History and Characteristics of the Defendant

Defendant has a troubling history demonstrating a consistent refusal to abide by the law. According to the PSR, Defendant has been convicted of numerous crimes since the age of 19, including (but not limited to) aggravated battery (PSR ¶ 129), battery (PSR ¶ 130), disorderly conduct (PSR ¶ 134), and directing or transporting for the purpose of lewdness (PSR ¶ 136). Victims testified to this last incident during the trial, which involved the trafficking of R.C. and

D.R.

Additional police reports tie the Defendant to prostitution activity as early as 2008 where he was arrested for procuring a person under the age of 18 for prostitution.  In that instance, he trafficked D.R. out of a motel in Hollywood, FL. (PSR ¶ 144).  In 2012, he was also arrested for living on the earnings of prostitution in Broward County, Florida for trafficking R.C. and D.R. (PSR ¶ 145).  In regards to all if these incidents, the defendant admitted during his post-Miranda interview with law enforcement that he had been arrested on multiple occasions for deriving support from the proceeds of prostitution.  In fact, during that interview, he admitted to only driving the girls to whatever they were doing, and any recent complaints against him were from R.C.'s mother.  All of this proved to be false.

Despite his previous convictions and arrests, the Defendant has remained undeterred by law enforcement.  Rather than learn from his past and live a law-abiding life, he chose to traffic at least six (6) girls in sex for more than fifteen (15) years, beating and sexually exploiting them while he made money as a trafficker.

Moreover, after being arrested in the instant case, the defendant attempted to obstruct justice by instructing another inmate to obtain recantations from R.C. and G.R.L.  He was convicted of this activity in Count 11.  Williams was even as specific as to identify all of the girls he had trafficked to the inmate, and provide directions to the homes of one of the victim's mother.

Even after being convicted at trial in this matter, Defendant still refuses to accept responsibility for his actions, objecting to facts regarding his use of physical violence in the PSR (DE 180).

### C.  Seriousness Of The Crime, Promote Respect For The Law, And Need For Just Punishment

Congress has explained that the "just desserts" concept in sentencing is a means of

17

reflecting the "gravity of the defendant's conduct," as well as the "harm done or threatened by the offense."  S. Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59.  Accordingly, "the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010), *cert. denied*, 131 S. Ct. 1813 (U.S. 2011).  In the present case, the significant harms inflicted and threatened by the Defendant's conduct designate the seriousness of the offenses and the need for a lengthy sentence.

Because "[t]he seriousness of the crime varies directly with the harm it causes or threatens …" this Court should impose the maximum sentence possible.  *Id*.  The Eleventh Circuit has held "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses …."  *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009) (discussing how courts have upheld lengthy sentences in cases involving child sex crimes as substantively reasonable).

The sex trafficking crimes committed by the Defendant in this case are grave offenses that inflicted immeasurable harm on the victims physically, mentally, and emotionally.  During the trial, the victims testified to the severe beatings they each endured and witnessed, which included the Defendant slapping, punching, kicking, tasing and throwing females.  The witnesses and victims testified to the horrific injuries sustained by each of these three victims during the course of the trial.  At the very least the defendant threatened each of the victims with serious bodily injury if they would not prostitute for him, kept any of the money without remitting it to him, or disrespected him in anyway (PSR ¶¶ 22, 33, 34, 49, 60, 79.)  The girls also testified to being intimidated by the Defendant's possession of firearms (PSR ¶¶ 22, 34).

During the trial, the victims testified about the psychological impact they have experienced as a result of Defendant's violence while in the prostitution ring.  Most of the victims came to tears during the trial as a result of having to recount the horrific experience of being trafficked and

abused by the Defendant.

As to additional sentencing factors for this court to consider, there is a strong need to promote respect for the law through an adequate punishment for the Defendant.  He has violated the law repeatedly throughout his life and his crimes have been extremely violent and sexually exploitive in nature. He has continued to show no regard for the law by attempting to obstruct justice while detained pending trial in this matter.  As to a provision of just punishment, the United States submits that a life sentence of incarceration is an appropriate punishment under the troubling facts and circumstances of this case.

### D.  The Need To Deter Future Criminal Conduct By The Defendant And Others And To Protect The Public From Further Crimes Of The Defendant

In an effort to abate similar conduct in the future, this Court should impose a severe sentence that will serve as a warning to individuals considering similar conduct.  A lengthy sentence will deter comparable activities by sending the message that such behavior is unacceptable and will be adjudicated harshly within the Southern District of Florida and the entire Eleventh Circuit.

"The more serious the crime and the greater the defendant's role in it, the more important it is to send a strong and clear message that will deter others." *Irey*, 612 F.3d at 1212.  By assuming a role in the trafficking of minors or women by force, fraud or coercion, the Defendant has volunteered to illustrate the repercussions for behavior that civilized society deems unacceptable. In a case as egregious as Williams', only a life sentence will send a message that human trafficking will be punished to the fullest extent of the law.

Based on the nature of Defendant's crimes and conduct, there is a compelling need to deter future similar conduct by him and other like-minded individuals with an interest in trafficking, beating, and threatening young girls in order to make money.  The sexual exploitation of young

girls and violence committed against them cannot be tolerated in our society.

Moreover, there is a strong need to protect the public from further crimes of the Defendant. He has an extensive criminal history, including prior convictions for prostitution related offenses. He has shown no remorse or acceptance of responsibility for his actions. In fact, he continued to violate the law after his arrest in this case by attempting to obstruct justice through his actions to use another inmate to intimidate G.R.L. and R.C. The Defendant has demonstrated no signs of changing his violent, sexually exploitive ways, and he continues to pose a serious danger to society.

### E. Sentencing Disparity Factors

The defendant argues that his guideline range produces an inflated and exaggerated sentence range (DE 196:2). The range in this case is life (PSR ¶ 175). Any sentence this Court imposes, which is not life in prison, is a downward variance from the guidelines. In support of his argument for a variance, he argues that other, more heinous crimes, create a lower guideline range; that the guidelines in this case include special offense characteristics (SOC) that would apply in every trafficking case; that the guidelines are inappropriately inflated; that the government and the victims exaggerated the defendant's use of force while minimizing the victim's willing participation in prostitution; and finally that other defendants charged with trafficking have received sentences less than life in prison (*see generally,* DE 196).

1. Defendant's Argument #1: Other, more heinous crimes, create a lower guideline range.

Williams makes a comparison of the guidelines in this case to the guidelines in other criminal violations, including homicide, kidnapping and treason (DE 196:5). He describes the "average version" of the sentencing guidelines of these violations without a single shred of analysis as to how he creates guidelines for violations that have nothing to do with this case (DE 196:5-6).

He thus makes the argument that sex trafficking is "not as serious" as other crimes, and thus the guidelines in this case are just too high.  (DE 196:6).  This argument is not based upon any empirical data or fact, and should be disregarded by the Court.

> 2.  Defendant's Argument #2: The guidelines in this case include special offense characteristics that would apply in every trafficking case.

In that the special offense characteristics (SOC) in this case apply in all sex trafficking cases, Williams essentially just disagrees with the various SOCs of the guidelines.  As detailed below, not as single one of these arguments is a lawful argument for departure, and the defendant does not cite precedent or legal principle allowing the same.

For example, counsel for the defendant asserts that in regards to the use of the cross-reference to USSG §2A3.1, such that USSG § 2G1.1 or USSG § 2G1.3 were not utilized, "in over 30 years of practice, [he] has yet to see a case where that enhancement would not apply."  Contrary to defense counsel's experience, this is not the case.  There have been human sex trafficking cases where the cross reference did not apply based upon the facts.  *See inter alia, United States v. De Jesus Vasuez*, 753 Fed. Appx. 800 (11th Cir. 2018) (base offense level based upon USSG § 2G1.3).  The defendant may not like the guidelines, but they apply because of his egregious conduct.

He also argues that the serious bodily injury SOC is "automatic."  In a previous hearing in this case, this Court specifically found that the three-level increase is appropriate (DE 194:9-10).  Again, the defendant may not like the guidelines, but they apply because of his egregious conduct.

Williams further argues that the 2-level increase for the SOC of use of a computer applies in every case because "in today's society it is practically impossible to commit the charged offense without using a computer" (DE 196:3).  To the contrary, the use of the computer (or phone in this case), makes it easier for the trafficker to conduct business.  Williams could have had the victims

only working at clubs where they would be solicited for sex, as he did for a time with D.L. (PSR ¶ 47).   He could have had the victim's prostitute by working the street and soliciting clients in person.   However, primarily, Williams utilized internet websites like Backpage and smartphone applications such as Life360 to traffic the victims and monitor their whereabouts.   Again, the defendant may not like the guidelines, but they apply because of his egregious conduct.

He then argues that the 5-level enhancement for pattern, pursuant to USSG § 4B1.5(b)(1) applies in nearly every case (DE 196:4).   When conduct stems over 15 years, as it did in the case involving Williams, there is no doubt that a pattern applies and appropriately reflects the conduct in this case.   Williams has not filed a legal objection to this guideline enhancement.   Again, the defendant may not like the guidelines, but they apply because of his egregious conduct.

Williams then finishes his diatribe complaining about his guidelines, when it was his conduct that created the guidelines, saying, "Mr. Williams and pretty much anyone convicted of this offense could not receive a lower adjusted offense level than 47."   This is just a false statement, not based on any fact.   Repetitive as it may be, the defendant may not like the guidelines, but they apply because of his egregious conduct.

> 3.   Defendant's Argument #3: Human trafficking guidelines are inflated like child pornography guidelines.

In his next attempt to have this Court disregard the guidelines entirely, the defendant attempts to conflate the severity of the child pornography guidelines with the guidelines for sex trafficking.   First, these are not the same guidelines.   Second, even if the controlling guidelines were identical, the Eleventh Circuit has already rejected the argument that the 2013 report of the United States Sentencing Commission invalidates the child pornography guidelines in *United States v. Cubero*, 754 F.3d 888, 900 (11th Cir. 2014).   *Cubero* specifically noted that this report

did not undermine the otherwise substantially reasonable low-end guidelines sentence of 151 months for the child pornography offense at issue. *Id*. at 900-01.  Williams' argument against the guidelines is unreasonable and not based in fact or supported by controlling case law.

### 4.   Defendant's Argument #4: The use of force is exaggerated in this case

The defendant next argues that the government and the victims have exaggerated the force used on the victims.  This Court and a Jury heard three weeks of evidence as to the constant physical, mental and psychological abuse the victims endured.  The PSR goes into great detail as to the facts of this (PSR ¶¶ 19-22; 33-34; 45; 49; 51-53; 56; 60-61; 68-69; 75; 84).  The Defendant objected to many of these facts (DE 180) and this Court overruled nearly every one (DE 194).  The defendant may have in his mind what he believes he did or did not do to the victims, but his notions are not based in fact.

Williams suggests that the government and victims "exaggerated" Williams's use of force and control and "minimized" the victim's participation in the prostitution (DE 196:6).  He bases this on several points, none of which carry any weight and should be completely disregarded by the Court.  First, he assert that because the jury acquitted Williams for conduct relating to R.C., T.L., and K.C., that those victims' testimony was "clearly rejected" by the jury.  That is not true.  The jury found him *not guilty* related to those victims.  That only means the jury did not find beyond a reasonable double he committed those crimes.  No one, including the defendant, despite his firm assertion to the contrary, knows why the jury acquitted Williams for the conduct committed against R.C., T.L., and K.C.  Nevertheless, the standard of proof at sentencing for determining the guidelines is based upon the preponderance of the evidence.  This Court heard all of R.C., T.L., and K.C.'s testimony and made findings regarding their testimony's inclusion in the PSR at a previous hearing (DE 194).

The fact that Williams, to this day, does not accept responsibility for his actions, despite a jury convicting him of those actions, is even more of a reason for this Court to sentence the defendant within the guideline range of life in prison. Defendants who accept responsibility by pleading guilty take advantage of a two or three level reduction in their guidelines. Even after a trial, a defendant can accept responsibility. Williams has done neither.

5.   Defendant's Argument #5: Disparity of sentences.

The defendant makes one final argument, grounded in one aspect of the Sentencing Guidelines. Title 18, United States Code, Section 3553 warns against an "unwarranted sentence…among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6). However, a defendant is not entitled to relief based on sentence disparity alone; he has to establish that his sentence is unreasonable, taking into account all of the section 3553(a) factors. *Irey*, 612 F.3d at 1197, n. 24 (section 3553(a)(6)'s sentencing –disparity factor "must be weighed against the other § 3553(a) factors" and "all of the § 3553(a) factors are to be weighed against each other in order to determine the proper sentence") (quoting *Kimbrough v. United States*, 552 U.S. 85, 108, 128 S. Ct. 58, 574 (2007)). He has not provided any valid argument that there is any other basis to vary down from a life sentence under another § 3553(a) provision.

In any event, Williams has not established that a life sentence is disparate under section 3553(a)(6). Citing to the sentences imposed in a few other cases where non-life sentences have been imposed, as Williams has done, does not create a disparity when the facts of his case, his personal history, and other factors noted above, demand a life sentence be imposed. Every district court therefore cannot be required to impose equally lenient sentences "to avoid disparity." Cf. *United States v. Chotas*, 968 F.2d 1193, 1197-98 (11th Cir. 1992) ("to adjust the sentence of a co-

defendant in order to cure an apparently unjustified disparity between defendants in an individual case will simply create another, wholly unwarranted disparity between the defendant receiving the adjustment and all similar offenders in other cases").

First, the Defendant cites to *United States v. Taylor Jordan Wardlow*, 15-CR-60025-Altonaga, arguing that Wardlow's offenses are similar to Defendant's, and thus Defendant should receive a similar sentence.  While Wardlow's offenses are serious and worthy of significant punishment, they are facially distinguishable.  First, according to the second superseding indictment (DE 65) and criminal complaint (DE 1), Wardlow trafficked two juveniles over approximately twenty-five days.  Williams, however, stands convicted of trafficking three women over a period of eleven years.  Second, Wardlow was not convicted of any crime involving force, threats of force, fraud or coercion.  Williams, however, stands convicted of three such offenses and the victims' testimony described brutal forms of abuse, torture, and physical control.  Further, Williams was convicted of obstruction, whereas Wardlow was not.

Defendant also cites to *United States v. Robert Cox and Timothy Myers*, 09-CR-60243-Cohn, and this case is likewise distinguishable.  A review of the complaint (DE 1) and superseding indictment (DE 45) reveal that Cox was convicted of trafficking one victim for approximately one month and another victim over a four-day period.  Cox was likewise not convicted of any offenses involving force, threats of force, fraud or coercion, nor obstruction.  As in *Wardlow, supra*, Cox's offenses are not comparable to Williams' offenses.

Next, the Defendant cites to *United States v. Godijah Dawkins*, 15-CR-60108-Dimitrouleas, which is also factually distinguishable.  Dawkins accepted responsibility and pled guilty (DE 37) to the two-count indictment, which charged him with trafficking one victim over a period of five months and another victim over a period of one month (DE 17).  Dawkins was

sentenced to 180 months after the government (DE 37) and defense filed a joint recommendation for downward variance, each party recommending the 180-month sentence (DE 35).

The Defendant further cites to *United States v. Duke*, 08-CR-60261-Middlebrooks, DE 23, which bears no resemblance to the instant case.  Based on court filings, it appears that Duke was charged with paying to participate in masturbation with juvenile males, and that Duke was not involved in profiting from the sexual activity of anyone.  Further, Duke accepted his responsibility and pled guilty to three counts: sex trafficking of a minor, enticing a minor to engage in prostitution and sexual activity, and possession of child pornography (DE 44).  These offenses occurred over a three-month period in 2004, and while Mr. Duke was only convicted of trafficking one minor, he was originally charged with victimizing three minors (DE 23).  At the time of sentencing, Mr. Duke was sixty-nine years old and an Army veteran (DE 39).

The Defendant also cites to *United States v. Pierre*, 09-CR-60132-Dimitrouleas, which like the previously cited cases, is not only distinguishable from Williams, but the facts outline in the William's motion are much more than what was agreed to for the plea (DE 63).  The facts agreed upon by the parties in the factual proffer describe Pierre and another man as providing locations for two minor girls to prostitute, while providing them clothing, food and condoms (DE 63).  There was no mention in the agreement regarding narcotics, violence or an abortion (nor does the defendant cite to a source for this information (DE 196:10)), so it is unknown if the District Court knew of these facts when issuing the 10-year sentence nearly ten years ago (DE 86).

Finally, the Defendant also cites to *United States v. Mavour*, 13-CR-60226-Hurley, in which the defendant plead guilty to two counts of sex trafficking of minors (DE 67).  The factual proffer agreed upon by the parties for the purpose of pleading guilty, outlined that Mavour, posing as a female, met two minor-females online and convinced them to begin prostituting for him (DE

48).  The first girl was trafficked for ten days; the second was trafficked for approximately four months (DE 30).  Just as in the defendant's summary of the *Pierre* case, *supra*, the fact that Mavour abused or raped these girls was not noted in the factual proffer to Judge Hurley and was not cited from any court document.   Therefore, once again, it is unclear exactly what the District Court knew of when issuing the 15-year sentence (DE 67).  Regardless, not the *Mayour* case, nor any other case cited by the defendant comes close to the horrific and egregious nature of Williams conduct, or his history.

Nevertheless, no matter how—or if—an unreasonableness claim based on disparity alone can be established, Williams has not accomplished that here.  For starters, a sentence of life is a guideline-range sentence, which by itself is evidence of non-disparity.  *See Gall,* 552 U.S. at 54, 128 S. Ct. 586 ("[A correct Guidelines range] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities."); *United States v. McCarity*, 669 F.3d 1218, 1264 (11th Cir. 2012) (by considering offense level under the sentencing guidelines, district court "necessarily limits any unwarranted disparity that might arise in the sentences of defendants in diverse locales"); *see United States v. Moriarty*, 429 F.3d 1012, 1024 (11th Cir. 2005) (per curium) ("in general, a sentence within the limits imposed by statue is neither excessive nor cruel and unusual under the Eighth Amendment.").

In *United States v. De Jesus Vasuez*, 753 Fed. Appx. 800 (11th Cir. 2018), the court affirmed the <u>360-month, above guideline sentence</u>, on one count of sex trafficking of a minor, stating:

> "the district court stated that it would have imposed a sentence higher than 360 month's imprisonment if Defendant had not entered an early guilty plea.  Clearly, what, in large part, drove the sentence was conduct toward minor girls that the district court concluded to be horrific.  Indeed, the court mentioned that it had repeatedly imposed sentences beyond what was requested by the Government in cases involving the sexual exploitation of a minor."

*Id.* at 806.  De Jesus Vasquez met the 14-year-old victim who was a runaway.  *Id.* at 801.  Over several weeks, he trafficked the victim, using drugs and alcohol as manipulation.  *Id.*  He provided her a cell phone, set the prices for her prostitution, and rented hotels for her where she would see 6-10 clients per day; he help all of her earrings.  *Id.*  The facts of this case are different from Williams but to the same level of viciousness, length and number of victims.

In *United States v. Harris*, 741 Fed. Appx. 663, 664 (11th Cir. 2018), the Eleventh Circuit upheld a <u>30-year sentence</u> where the defendant trafficked a 16-year-old girl who ran away from home and the defendant offered to care for.  He posted her sexually suggestive photos to Backpage.com, from which Harris had the victim prostitute for two weeks, seeing 4-5 clients per day.  In return for giving him all of her moneys made, Harris provided her crack.  He faced 15 years' to life imprisonment.  Harris was young and found to have a very low IQ of 55.  *Id.* at 665.  At sentencing, not only did the defendant seek a variance down to the 15-year minimum mandatory, the government even recommended a one-level downward variance, recommending a sentence between 30 and 40 years.  *Id.* at 666.  In upholding the 30-year sentence, the Court found that the district court considered the § 3553(a) factors and considered Harris' diminished capacity, holding, "[i]t was within the district court's discretion to give more weight to some § 3553(a) factors, including the severity of the crime and Harris' criminal history."  *Id.* at 669.

In *United States v. McKinley*, 647 Fed. Appx. 957 (11th Cir. 2016), the defendant was sentenced to <u>two life sentences</u> for kidnapping and sex trafficking.  The Appellate Court upheld this sentence as substantially reasonable because:

> "life sentences are within his guidelines range, which means that we expect them to be reasonable.  In addition, the record reveals that the district court considered mitigating factors, such as McKinley's difficult youth, past sexual abuse, mental health issues, and his potential to obtain a profession and become a productive member of society.  It also considered [the victim's] prior voluntary prostitution

and the small scale of McKinley's sex-trafficking scheme as mitigating factors. After looking at the nature and circumstances of the offense, the court determined that McKinley's victimization of Wilson was a significant aggravating factor, as well as McKinley's extensive prior criminal history.   It then weighed the aggravating and mitigating factors and determined that life sentences were fair and just."

*Id.* at 967.  The victim's testimony provided the majority of the facts in this case.  She averred that McKinley used threats and violence to keep her with him and force her to prostitute.  *Id.* at 961. A witness confirmed the victimization.  *Id.*  This is not unlike the case against Alston Williams wherein each victim confirmed the violence and prostitution of the other victims; six in total. However, in the case at bar, the victims did not engage in prostitution until meeting the defendant. Williams has no mitigating factors.

In *United States v. Fields*, 625 Fed. Appx. 949, 952 (11th Cir. 2015), based primarily upon victim testimony,

"Fields recruited and enticed women to engage in prostitution by (1) proposing to advertise their prostitution services online, (2) driving them to their prostitution locations, and (3) offering them drugs, money and a place to live if they prostituted for him.  After recruiting them to engage in commercial sex acts, Fields substantially increased their drug addictions...[and] withholding pills from them… render[ing] them dependent on him and subservient to his demands."

The Eleventh Circuit affirmed Field's <u>405-month sentence</u> for five counts of sex trafficking by force, fraud or coercion, and thee narcotic-distribution related counts after a jury trial, noting in particular, the district court's focus on the nature and circumstances of the crime in that Field "preyed on the victims' vulnerabilities and committed an outrageous crime," and his "lack of remorse."  *Id*. at 954.

In *United States v. Ian Sean Gordon*, 3:10-cr-130-MMH-TEM (M.D. Fla. 2010), *aff'd* 438 Fed. Appx. 859 (11th Cir. 2011), the defendant recruited a 15-year-old girl who was already engaged in prostitution to come prostitute solely for him.  To recruit clients, he showed a naked picture of the minor. After she began prostituting for him, Defendant eventually started to use force

and threats of force against her.  He hit her on several occasions and threatened to hurt her if she left the motel room.  He also informed the minor victim that it would not bother him to kill her and he possessed a firearm. He had sex with the minor against her will and required her to stay naked in between dates to prevent her from escaping.  At one point, she escaped and he then dragged her back into his car.  In total, the minor victim prostituted for the defendant for 10-14 days. The defendant pled guilty to one count of violating 18 U.S.C. § 1591 and was ultimately sentenced to life in prison. *See also, United States v. Justin Cephus & Jovon Stewart*, 2:09-CR-43 (N.D. Ind. 2009), *aff'd in part, remanded in part*, 2012 WL 2609316 (7th Cir. 2012) (sentencing two defendants to life sentences post-trial for enticing dozens of girls into an escort agency and ultimately beating several girls).

Additionally, courts have imposed substantial sentences in sex trafficking cases that did not have the number of victims or level of violence as Williams; moreover, the defendants accepted responsibility and provided substantial assistance to the United States.  *See United States v. Eric Bell*, 8:11-CR-505-T-30MAP (M.D. Fla. 2011) (sentencing defendant to thirty years imprisonment for sex trafficking four minors after receiving a three level departure for acceptance of responsibility and a four-level departure pursuant to 5k1.1); *United States v. Miguel Morancy*, 8:11-CR-505-T-30MAP (M.D. Fla. 2011) (sentencing defendant to two hundred and sixty-two months imprisonment after guilty plea for sex trafficking a thirteen year old and receiving a four-level departure pursuant to 5K1.1)

In the end, this Court could examine dozens of cases in which sex trafficking defendants have been sentenced.  However, sex trafficking cases are unique in that the facts of each case will always be different from the next case.  Williams however, took matters to the extreme with the number of victims, the recruitment, the violence, the control, and the length of trafficking.

**F.  Is There Any Argument for a Variance?**

What Williams fails to argue is any reason based upon his life, his family, or anything positive he has provided to society, as a reason for departure.  He does not because he cannot. Williams' entire adult life has been crime-ridden to try to make money at anyone else's expense including the violent, abusive trafficking of at least six girls and women over the last 15 years. Williams does not appear to have a single redeeming quality as evidenced by the fact that he used his own mother to coordinate a scheme to defraud Ygrene in an effort to bond himself out of jail.

## IV. CONCLUSION

For the foregoing reasons, the United States requests this Court impose three concurrent life sentences and twenty years of incarceration for the Defendant Alston Orlando Leroy Williams.

Respectfully submitted,

ARIANA FAJARDO ORSHAM
UNITED STATES ATTORNEY

By: _s/ Gregory Schiller_
Gregory Schiller
Assistant United States Attorney
Court ID No. A5501906
500 South Australian Avenue Suite 400
West Palm Beach, Florida 33401
Phone: (561) 209-1045
Email: Gregory.Schiller@usdoj.gov

By: _s/ Justin Hoover_
Justin Hoover
Special Assistant United States Attorney
Florida Bar #: 092450
500 South Australian Avenue Suite 400
West Palm Beach, Florida 33401
Phone: (561) 355-7396
Email: jhoover@sa15.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 28, 2019, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.


By: <u>*s/ Gregory Schiller*</u>
Gregory Schiller
Assistant United States Attorney